UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MILTON S. HERSHEY MEDICAL
CENTER et al.,

     *Plaintiffs*,

    v.

XAVIER BECERRA,[1]

     *Defendant*.

Civil Action No. 19-2680 (TJK)
(Consolidated with 19-cv-3763, 19-cv-3411, 19-cv-3788, and 20-cv-460)

## MEMORANDUM OPINION

Plaintiffs in these consolidated cases are teaching hospitals that receive Medicare reimbursement payments for training physicians in their residency programs. They challenge a regulation promulgated by Defendant, the Secretary of Health and Human Services, that affects the number of their full-time equivalent residents used to calculate those payments. Plaintiffs allege that, at least as applied to them, the regulation conflicts with the Medicare statute and that it is an arbitrary and capricious exercise of agency discretion under the Administrative Procedure Act. Before the Court are two cross-motions for summary judgment filed by Plaintiffs and one filed by Defendant. The Court holds that Defendant's application of the regulation to compute Plaintiffs' full-time equivalent residents was contrary to law because the regulation effectively changed the weighting factors statutorily assigned to residents and fellows. Thus, the Court will grant Plaintiffs' motions, deny Defendant's, and remand to the agency so that it may recalculate Plaintiffs' reimbursement payments consistent with this Opinion.

---

[1] Defendant Xavier Becerra, the current Secretary of Health and Human Services, is automatically substituted for Alex Azar under Federal Rule of Civil Procedure 25(d).

## I.      Background

### A.      Statutory and Regulatory Scheme

Under Subsection (h) of the Medicare Act, 42 U.S.C. § 1395ww(h), the Center for

Medicare and Medicaid Services (CMS) of the Department of Health and Human Services

reimburses hospitals prospectively for costs associated with "resident stipends, supervisory

physician salaries, and administrative costs."  Cong. Res. Serv., Federal Support for Graduate

Medical Education: An Overview 11 (updated Dec. 27, 2018), https://fas.org/sgp/crs/

misc/R44376.pdf ("CRS Report").  These reimbursements, known as direct graduate medical

education ("DGME") payments, are the product of a hospital's "patient load" [2] and its "approved

amount." 42 U.S.C. § 1395ww(h)(3)(A).  The approved amount, in turn is calculated by

multiplying the per-resident amount ("PRA")[3] by the weighted average number of full-time

equivalent ("FTE") residents employed by the hospital.  § 1395ww(h)(3)(B).  The weighted

average number of FTEs is the average of "the actual full-time equivalent resident counts for the

cost reporting period and the preceding two cost reporting periods."  § 1395ww(h)(4)(G).  Thus,

this DGME formula may be represented as follows:

PRA $\times$ 3 Year Weighted FTE Average $\times$ Medicare Patient Load $=$ DGME Payment

This case involves a dispute over the calculation of one of the three elements that go into

calculating a hospital's DGME payment: each hospital's weighted number of FTE residents.

The Medicare statute dictates that the Secretary "shall establish rules consistent with

[subparagraph (h)(4)]" to determine the weighted number of FTEs.  § 1395ww(h)(4)(A).  Two

---

[2] Patient load is the fraction of inpatient-bed-days attributable to Medicare patients.  42 U.S.C.
§ 1395ww(h)(3)(C).

[3] The PRA is the hospital's cost of treating patients in 1984, updated for inflation.  42 U.S.C.
§ 1395ww(h)(2).

2

other portions of subparagraph (h)(4), described in more detail below, are important to the

parties' dispute: the weighting factors for FTE residents based on the duration of their

employment, and the "cap" on the number of FTEs a hospital may count for purposes of a cost

reporting period.

First, the statute sets different weights for residents depending on whether they are within

their initial residency period ("IRP") of five years.  *See* § 1395ww(h)(4)(C); § 1395ww(h)(5)(F).

When students graduate from medical school, they often continue their training in a residency

program, gaining experience in a specialty field.  CRS Report at 2.  This training period lasts

three to five years and is reflected in the statute as the five-year IRP.  *Id.*; § 1395ww(h)(5)(F).

Some residents complete a fellowship, receiving further training in a subspecialty.  CRS Report

at 3.  Thus, fellowships typically occur outside the IRP.[4]  Under the statute, the Secretary's rules

for calculating the weighted average number of FTEs "shall provide . . . for a resident who is in

the resident's initial residency period . . . , the weighting factor is 1.00, . . . and . . . for a resident

who is not in the resident's initial residency period . . . , the weighting factor is .50."

§ 1395ww(h)(4)(C).  Thus, the statute requires that (1) residents must be weighted at 1.0, such

that their time is fully counted; and (2) fellows must be weighted at 0.5, with half their time

factoring into the FTE calculation.  *Id.*

Second, in 1997, Congress amended the statute to set a limit on how many FTEs a

hospital may factor into the count, before application of the weighting factors.  As amended, that

part of the statute reads:

> [F]or purposes of a cost reporting period beginning on or after
> October 1, 1997 . . . the total number of full-time equivalent
> residents before application of weighting factors . . . may not

---

[4] The parties use the term "resident" for residents within IRP, and "fellows" for those outside the
IRP.  The Court will do the same.

> exceed the number . . . of such full-time equivalent residents for the hospital's most recent cost reporting period ending on or before December 31, 1996.

Pub. L. No. 105-33, § 4623, 111 Stat. 251, 477–78 (1997) (codified as amended at 42 U.S.C. § 1395ww(h)(4)(F)(i)).  Under this provision, a hospital cannot claim for purposes of reimbursement any residents or fellows above that hospital's 1996 levels.  *See id.*

The regulation at the center of the parties' dispute was originally promulgated by the Secretary in 1997 "to address situations in which a hospital increases the number of FTE residents over the cap."  63 Fed. Reg. 26,318, 26,330 (May 12, 1998).  Today, as amended, it reads:

> If the hospital's number of FTE residents in a cost reporting period beginning on or after October 1, 2001, exceeds the [1996 cap], the hospital's weighted FTE count (before application of the limit) . . . will be reduced in the same proportion that the number of FTE residents for that cost reporting period exceeds the number of FTE residents for the most recent cost reporting period ending on or before December 31, 1996.

42 C.F.R. § 413.79(c)(2)(iii).  Thus, the regulation operates as follows:

$$\frac{1996 \text{ Cap}}{\text{Unweighted FTEs}} \times \text{Weighted FTEs} = \text{Post-Regulation Weighted FTEs}$$

*See* ECF No. 32-1 at 148–50 (confirming that the equation accurately represents the regulation's mandate).  The regulation operates to reduce the weighted number of FTEs a hospital may claim for reimbursement when that hospital's unweighted FTE count exceeds the 1996 cap.  *See id.* When a hospital exceeds the cap, its weighted FTE count is reduced commensurate with the amount by which the hospital exceeds the cap.  *Id.*  For example, assuming a cap of 100, and that a hospital meets that cap by employing 90 residents and 10 fellows, after weighting the fellows at 0.5, its post-regulation weighted FTE count is 95:

$$\frac{100}{100} \times 95 = 95$$

But if that hospital adds 10 more fellows (for a total of 90 residents and 20 fellows), thereby *exceeding* the cap, its post-regulation weighted FTE count is reduced as follows:

$$\frac{100}{110} \times 100 = 90.91$$

Several parties, including some plaintiffs in this case, commented on this regulation during the rulemaking process. *See generally* ECF No. 32-1 at 10–23. But none of the comments asserted that this provision was unlawful on the grounds asserted here. *See id.*

## B.      These Lawsuits

Five suits are now consolidated before this Court. In all of them, hospitals challenge their DGME reimbursements for various fiscal years dating back as far as 2005.[5] Minute Order of May 18, 2020. Each hospital trained residents in the fiscal year 1996. *See, e.g.*, ECF No. 32-1 at 154–179 (*Hershey* plaintiffs); ECF No. 11 ("Am. Compl.") ¶ 40. For every fiscal year at issue, Plaintiffs exceeded their 1996 caps and employed fellows. *See* ECF No. 32-1 at 159–184 (Lines 5.00, 6.00, 8.00). And CMS's third-party contractor applied 42 C.F.R. § 413.79(c)(2)(iii) to derive the weighted average number of FTEs and calculate each Plaintiff's DGME reimbursements.[6] *Id.* (Line 9.00). As a result, Plaintiffs allege that their reimbursements were unlawfully reduced. For example, the *Hershey* plaintiffs assert that their reimbursements were

---

[5] The complaint in each case lists the exact fiscal years challenged by each hospital. *See* ECF No. 11 (*Hershey* plaintiffs); Case No. 19-cv-2763, ECF No. 1 ("Vermont Compl.") (*Vermont* plaintiffs); Case No. 19-cv-3411, ECF No. 1 (*Barnes* plaintiffs); Case No. 19-cv-3788, ECF No. 4 (*Banner* plaintiffs); Case No. 20-cv-460, ECF No. 1 (*Arthur* plaintiffs).

[6] CMS contracts with private companies called Medicare Administrative Contractors (MACs) to administer Medicare payments. 42 U.S.C. § 1395kk-1; 42 C.F.R. § 405.1803(a). After participating hospitals submit cost reports to the MACs, the contractors create a "Notice of Program Reimbursement" (NPR) for each hospital that contains the DGME payment. *Id.*

collectively reduced by $12,850,321 during the relevant years.  Case No. 19-cv-02680, ECF No. 17 ("Pls. Mot.") 23; *see also* ECF No. 32-1 at 158.

Subject to certain procedural requirements, hospitals may appeal their reimbursement decisions to the Provider Reimbursement Review Board (Board) within CMS.  *See* 42 U.S.C. § 1395oo(a).  However, the Board lacks the legal authority to decide the validity of a Medicare regulation.  42 C.F.R. § 405.1867.  And when faced with such a question, it may grant expedited judicial review to allow the appealing parties to file an action in federal court.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.

Here, each hospital timely appealed their DGME decisions to the Board, *see*, *e.g.*, ECF No. 32-1 at 145 (*Hershey* plaintiffs), and each contested the application of 42 C.F.R. § 413.79(c)(2)(iii) to their reimbursement calculation.  *See id.*  The hospitals alleged that the regulation unlawfully reduced the capped payment to which they were entitled, and that it reduced the weighting factor for fellows.  The Board granted expedited judicial review, concluding that it lacked authority to decide whether the regulation was valid.  *Id.* at 156.  The hospitals then filed various suits in this district, alleging that the regulation is contrary to law and arbitrary and capricious.  Defendant moved to consolidate the five pending actions, and the hospitals in four cases agreed to consolidate.  *See* ECF No. 13 at 2.  The *Vermont* plaintiffs opposed consolidation, arguing that their litigation was at a more advanced stage.  *See* ECF No. 16; Minute Order of May 18, 2020.  On April 15, 2020, the plaintiffs in *Vermont* filed a motion for summary judgment.  Case No. 19-cv-02763, ECF No. 20 ("Vermont Mot.").  The four other plaintiffs filed their joint motion on April 24, 2020.  Pls. Mot.  On May 18, 2020, the Court consolidated all five cases.  *See* Minute Order of May 18, 2020.  Defendant's cross-motion, ECF No. 26, responds to both motions.

**II.     Legal Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law." *Id.* "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Alston v. Lew*, 950 F. Supp. 2d 140, 143 (D.D.C. 2013).

**III.     Analysis**

Plaintiffs challenge the regulation as both contrary to the statute and arbitrary and capricious as applied to them. *See* Vermont Mot.; Pls.' Mot. In response, Defendant asserts that Plaintiffs waived their challenge because they did not raise these issues during the regulation's notice-and-comment period. Defendant also argues that the Medicare statute is ambiguous, and that the regulation is a reasonable exercise of his discretion. The Court finds that Plaintiffs' claims are properly before the Court. Further, it holds that Defendant's application of the regulation to calculate Plaintiffs' reimbursement payments was unlawful because, in calculating the weighted number of FTE residents, the regulation effectively changed the weighting factors for residents and fellows that Congress established in the Medicare statute. The parties devote much of their briefing to the closely-related, broader issue of whether the statute "entitles hospitals to payment based on all FTEs that do not exceed the cap." Pls. Mot. at 30. But the Court need not reach that question to conclude that the regulation at issue, as applied to Plaintiffs, is unlawful because of the way it affects the weighting factors.

A.      **Waiver**

Before turning to the merits, the Court dispenses with Defendant's waiver argument.  He

argues that Plaintiffs waived their challenge to 42 C.F.R. § 413.79(c)(2)(iii) because they did not

raise these objections during the regulation's notice-and-comment period.[7]  *See* ECF No. 31 at 3.

The Court disagrees.  In general, "a party must initially present its comments to the agency

during the rulemaking in order for the court to consider the issue."  *Cal. Communities Against*

*Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) (citing *Tex. Tin Corp. v. EPA*, 935 F.2d

1321, 1323 (D.C. Cir. 1991)).  This doctrine ensures that an agency has "an opportunity to

consider the matter, make its ruling, and state the reasons for its action."  *Oklahoma Dep't of*

*Env't Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014).

Even so, failure to raise an issue during rulemaking does not foreclose judicial review in

every case: "when an agency seeks to apply a rule, those affected may challenge that application

on the grounds that it conflicts with the statute from which its authority derives."  *Weaver v. Fed.*

*Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014) (collecting cases) (cleaned up);

*see also Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior*, 270 F.3d 957, 959 (D.C. Cir.

2001) ("[L]imit[ing] review to the adoption of the rule without further judicial relief at the time

of its application . . . would effectively deny many parties ultimately affected by a rule an

opportunity to question its validity.")  When "plaintiffs timely challenge the application of a

regulation through the Board's review process, their failure to raise their challenges through

comments to the proposed regulation during the rulemaking process does not constitute a

waiver."  *E. Texas Med. Ctr.-Athens v. Azar*, 337 F. Supp. 3d 1, 13 (D.D.C. 2018).

---

[7] The Secretary concedes that Plaintiffs have complied with the procedures for judicial review set forth in 42 U.S.C. § 1395 *et seq*. and that the Court has subject matter jurisdiction over the claims.  *See* ECF No. 31 at 10.

Plaintiffs challenge the regulation's application to the calculation of their Medicare reimbursement payments. *See* Am. Compl. ¶¶ 8–17; Vermont Compl ¶ 5. Thus, their claims are properly before the Court. *See Lee Mem'l Health Sys. v. Burwell*, 206 F. Supp. 3d 307, 327 (D.D.C. 2016) (finding that hospitals' challenge to "Medicare Outlier Regulations" was not waived even when they did not comment); *Banner Health v. Burwell*, 126 F. Supp. 3d 28, 68 (D.D.C. 2015) (reversed in-part on other grounds) ("[A] party may challenge the very validity of a regulation when that regulation is applied without waiving arguments that were not raised before the agency in the underlying rulemaking proceedings.").

## B.       Plaintiffs' Administrative Procedure Act Claims

Plaintiffs argue that the regulation is inconsistent with the Medicare statute as applied to them, but the Defendant defends it as consistent with its interpretation of the law. As in any case in which a plaintiff challenges an agency's interpretation of a statute, the familiar *Chevron* framework applies. "If the Court determines that 'Congress has directly spoken to the precise question at issue,' and 'the intent of Congress is clear, that is the end of the matter.'" *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018) (citing *Chevron. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)). "If, however, 'the statute is silent or ambiguous with respect to the specific issue,' then the Court must determine 'whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843).

The Court will begin, as it must, with the language of the statute. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). "[U]nder *Chevron*, [courts] owe an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' [they] find [themselves] unable to discern Congress's meaning." *SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9). At *Chevron* step one, courts

"examine the [statute's] text, structure, purpose, and legislative history to determine if the Congress has expressed its intent unambiguously." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016). A statute is unambiguous when "'Congress has directly spoken to the precise question at issue,' and 'the intent of Congress is clear.'" *City of Clarksville*, 888 F.3d at 482 (quoting *Chevron,* 467 U.S. at 842).

The relevant portion of the statute, § 1395ww(h)(4)(C), commands that rules created under that paragraph "shall provide, in calculating the number of full-time-equivalent residents in an approved residency program," that residents be weighted at 1.0 and fellows at 0.5. § 1395ww(h)(4)(C). But, Plaintiffs say, 42 C.F.R. § 413.79(c)(2)(iii) contravenes that unambiguously expressed intent of Congress because, for those hospitals that exceed the cap, it effectively overrides the weights that the statute sets for their residents and fellows. Pls. Mot. at 28. Plaintiffs are right. Take, for example, the hypotheticals already discussed above, where the cap is assumed to be 100:

- If a hospital employs 90 residents and 10 fellows: (100 / 100) x 95 = Post-Regulation Weighted FTE of 95.

- If the hospital adds 10 fellows to this total, thus exceeding the cap: (100 / 110) x 100 = Post-Regulation Weighted FTE of 90.91.

As the first example shows, when a hospital is below or meets the cap, its post-regulation weighted FTE reflects the weights for residents and fellows that Congress established. Thus, the weighted FTE of 95 reflects 90 residents (weighted at 1.0) and 10 fellows (weighted at 0.5). But in the second example, when the hospital exceeds the cap, and employs fellows, the post-regulation weighted FTE no longer reflects those weights.[8]

---

[8] While that much is clear, precisely what weights this post-regulation weighted FTE actually reflects is hard to say. Because the regulation only reduces a hospital's weighted FTE below the

Simply put, the text of the statute does not give the Secretary the latitude to decide, under these conditions, to change the weights that Congress assigned to residents and fellows when he calculates the FTE residents for each hospital. Rather, the statute is clear: the Secretary's rules "shall provide, in calculating the number of full-time-equivalent residents in an approved residency program," that residents be weighted at 1.0 and fellows at 0.5. § 1395ww(h)(4)(C). When Congress uses the word "shall," its language is "mandatory or imperative, not merely precatory." *See United States v. Monzel*, 641 F.3d 528, 531 (D.C. Cir. 2011). Thus, the Court's inquiry ends at *Chevron* step one, and it holds that the regulation is unlawful as applied to Plaintiffs.

While the text of § 1395ww(h)(4)(C) is clear, the Court's reading is also bolstered by the surrounding provisions of the Medicare statute. "[I]n interpreting a statute, a court 'must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1986)). Contrary to Defendant's claims, these other provisions underscore that there are no gaps for the Secretary to fill in § 1395ww(h)(4)(C), because they show that when Congress wanted to give him broad discretion to promulgate rules for calculating Medicare reimbursement payments, it knew how to do so clearly.

For example, § 1395ww(d)(4)(A) directs the Secretary to create "a classification of inpatient hospital discharges by diagnosis-related groups and a methodology for classifying

---

cap if the hospital both exceeds the cap and employs fellows, the *Hershey* plaintiffs say that 90.91 FTE should be interpreted as reflecting 90 residents (weighted at 1.0) and 20 fellows (weighted at 0.0455). Pls. Mot. at 36. But in theory, the number could also be interpreted as reflecting 90 residents (weighted at 0.899) and 20 fellows (weighted at 0.5). Regardless, the parties have not identified, nor can the Court discern, any scenario in which the regulation preserves the weights that Congress mandated.

specific hospital discharges within these groups."  In doing so, it simply authorizes him to assign

an "appropriate" weighting factor of his choosing.  § 1395ww(d)(4)(B).  True, other provisions

in subparagraph (d)(4) create conditions under which the Secretary must make changes to those

weighting factors, but the statute leaves to his discretion which factors to assign, and how, in the

first place.  *See generally* § 1395ww(d)(4).  Similarly, § 1395ww(d)(3)(E)(i) gives the Secretary

authority to adjust wage indexes across geographic areas.  The Secretary must adjust the standard

prospective payment rate by "a factor (established by the Secretary)" that "reflect[s] the relative

hospital wage level in the geographic area of the hospital compared to the national average

hospital wage level."  *Id.*  This provision, the D.C. Circuit has acknowledged, reflects a broad

grant of discretion to the Secretary.  *See Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1164

(D.C. Cir. 2015).  In contrast, the relevant statutory language here is specific as can be about the

appropriate weighting factors.

       Moving even closer to § 1395ww(h)(4)(C), subparagraph (h)(4) contains several

opportunities for the Secretary to craft rules relating to the determination of a hospital's FTE

residents that are "consistent" with it.  Again, this reflects that when Congress wanted to provide

those opportunities in the statute, it knew how to do so.  For example, subparagraphs (4)(F)(ii)

and (4)(K) task the Secretary with defining maternity, disability, and other approved leave for

purposes of resident FTE accounting.  *See* § 1395ww(h)(4)(F)(ii); § 1395ww(h)(4)(K).  Another

provision directs the Secretary to give "special consideration" to new hospitals in underserved

rural areas when creating rules to implement the FTE cap, without defining that term.
§ 1395ww(h)(H)(i)(I).  Further, the Secretary "may prescribe rules" to allow institutions in the

"same affiliated group (as defined by the Secretary)" to apply the cap on an aggregate basis.
§ 1395ww(h)(4)(H)(ii).  Finally, for certain urban hospitals that initiate rural programs, the

Secretary "shall adjust [the cap] in an appropriate manner . . . in order to encourage the training

of physicians in rural areas."  § 1395ww(h)(4)(H)(iv)(I).  But the statute says nothing that

provides the Secretary the leeway to adjust the resident and fellow weighting factors when it

determines a hospital's weighted number of FTE residents, whether to implement the FTE cap or

for any other reason.  § 1395ww(h)(4)(C).[9]

Defendant tries to save the regulation, but none of his counterarguments are persuasive.

Defendant argues that the statute "says nothing about how the weighted FTE count should be

computed when a hospital exceeds it unweighted FTE cap, much less what its ultimate [DGME]

payment . . . should be."  ECF No. 26 at 30.  On the latter point, perhaps so.  But to the extent

Defendant argues that the regulation is justified because the statute is silent about how the

Secretary may change the weighting factors in calculating a hospital's FTEs when a hospital

exceeds its cap and employs fellows, it is no argument at all.  A statute is not silent simply

because it fails to address every conceivable set of circumstances to which it might apply.  As

Judge Henderson has explained: "'Thou shall not kill' is a mandate neither silent nor ambiguous

about whether murder is permissible if committed after 5.00 p.m.—or, for that matter, if

committed in the billiard room with the candlestick . . . ."  *AFL-CIO v. FEC*, 333 F.3d 168, 181

---

[9] The Court notes that the statute's legislative history is of little use here, even apart from that sort of authority's inherent limitations.  In the Conference Report on the 1986 bill that created the weighting factors, Congress explained that "[l]imitations are placed on the way in which residents are counted toward full-time equivalency, once they have reached a specified point in their training."  H.R. Conf. Rep. No. 99-453, at 485 (1986). After July 1, 1987, for those residents who exceed the five-year limit, "payment will be made at 50 percent of the rate that would otherwise be recognized."  *Id.*  Similarly, the Conference Report for the 1997 bill establishing the cap reads: "[t]he number of FTE residents is weighted at 100 percent for residents in their initial residency period," and "[f]or residents not in their initial residency period, the weighting factor is 50 percent."  H.R. Conf. Rep. No. 105-217, at 820 (1997).  For the most part, these passages restate the text of the statute, but as explained above, that text clearly evinces congressional intent to constrain the Secretary's discretion about the weighting factors.

(D.C. Cir. 2003) (Henderson, J., concurring).  So while it is true that the statute does not specifically speak to the weighting factors that must be applied when a hospital exceeds its FTE cap, that is simply of no moment.  The statute is not silent or ambiguous as to what Congress instructed as to those weights when calculating FTEs, at least for those residents and fellows that the cap permits "for purposes of a cost reporting period."  § 1395ww(h)(4)(F)(i).

Defendant also contends that the directive to "establish rules consistent with this paragraph," § 1395ww(h)(4)(A), gives him the discretion to effectively adjust the weighting factors.  According to Defendant, "[n]othing in subparagraph (C) says that the two weighting factors it sets out must be the exclusive way to compute the weighted FTE count."  ECF No. 26 at 32.  This argument simply reads the words "consistent with the paragraph" out of the statute.  As outlined above, on the issue of the weighting factors given to residents and fellows, Congress has spoken "in plain terms" "to circumscribe," not "to enlarge, agency discretion."  *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

Finally, Defendant argues that the statutory weighting factors do not foreclose the regulation because its formula incorporates them.  *See* ECF No. 26 at 31–32.  This argument is no more convincing than the others.  The regulation only incorporates the weighting factors insofar as they serve to calculate a weighted FTE benchmark that is then reduced in accordance with a hospital's number of fellows if the hospital exceeds the cap.  *See* 42 C.F.R. § 413.79(c)(2)(iii).  But just because the Secretary created a formula for calculating FTEs that in some way incorporates the weighting factors does not mean that the number of FTEs that results from the formula reflects the weighting factors mandated by the statute.  Obviously, a regulation providing that "the weight for every employee statutorily weighted at 0.5 shall be reduced to 0.3" would conflict with the statute, even though such a regulation would nominally incorporate the

14

0.5 weight.  In the end, the regulation at issue here is no more consistent with the statute than that hypothetical one.

**IV.    Conclusion**

For all these reasons, Plaintiffs' motions for summary judgment will be granted and Defendant's motion for summary judgment will be denied.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 17, 2021